## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PVD PHASE II, LLC, an Oklahoma limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. <u>CIV-19-836-C</u> |
| SILVER ARCH CAPITAL PARTNERS, LLC, a New Jersey limited liability company, and JEFFREY WOLFER, an individual, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

For its causes of action against Defendants Silver Arch Capital Partners, LLC ("<u>Silver Arch</u>") and Jeffrey Wolfer ("<u>Wolfer</u>"), Plaintiff PVD Phase II, LLC ("<u>PVDII</u>") alleges and states as follows:

### <u>Parties, Jurisdiction, and Venue</u>

1.     PVDII is an Oklahoma limited liability company whose members are citizens of the State of Oklahoma.

2.     Silver Arch is a New Jersey limited liability company whose members are, upon information and belief, citizens of States other than Oklahoma.

3.     Wolfer is an individual and is, upon information and belief, a citizen of the State of New Jersey.

4.     There is more than $75,000 in controversy in this lawsuit and thus, subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(b).

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## Facts

6.      PVDII is a related entity to Pointe Vista Development, LLC ("PVD"), an Oklahoma limited liability company which owns certain real property located near Lake Texoma in Marshall County, Oklahoma (the "Property").

7.      Working in concert with PVD, PVDII was created as a special purpose bankruptcy remote entity and wholly owned subsidiary of Pointe Vista Holding, LLC to acquire and develop land from PVD.

8.      Among other plans for the Property, PVDII intends to develop two (2) residential areas: (a) Bridge Pointe, which is to be a 57 unit condominium development; and (b) Reflection Pointe, which is planned to have 84 home lots designed to be sold so that traditional residential homes can be constructed on them.

9.      PVDII also intends to construct various amenities associated with Bridge Pointe and Reflection Pointe such as common areas, swimming pools, etc.

10.     Silver Arch is located in New Jersey and is, upon information and belief, owned at least in part by its President and CEO, Wolfer.

11.     Silver Arch holds itself out to be "a leading private lender in the commercial real estate market" which "brings skill and creativity to every loan request."

12.     Based on these representations (and others), in late 2018 PVDII, by and through Oklahoma City based Infinity Capital Partners, LLC ("Infinity"), reached out to Silver Arch about obtaining a loan to: (a) payoff an existing loan on the real property; (b) develop the 84 lots at Reflection Pointe and construct three (3) spec homes thereon; (c)

develop and construct the condominiums at Bridge Pointe; and (d) construct the amenities related to Bridge Pointe and Reflection Pointe.

13.     In connection with these preliminary discussions, PVDII, through itself and Infinity, provided Silver Arch with financial models and cost projections and estimates which showed that the total operating and development costs for the work planned by PVDII at Reflection Pointe and Bridge Pointe (including the payoff of the existing loan on the property) was approximately $48 million, plus approximately $5 million in interest paid on a loan.

14.     PVDII also provided a substantial amount of other documents and information to Silver Arch concerning the proposed developments including a business plan, construction estimates, engineering proposals, etc.

15.     The business plan submitted to Silver Arch set forth an overview and summary of the more detailed financial models that had been provided and also discussed how PVDII intended to use the proceeds of a loan it sought to complete its work.

16.     Therein, PVDII explained that the "[f]inal cost construction is estimated to be $53,793,688 over a four-year time frame," but noted that "only a total peak debt load of $31 million will be required for the development as much of the construction costs are funded through lot and residence sales and construction of additional units past the $31MM total will not occur without appropriate sales during the initial two-year term."

17.     From this document, it was made clear to Silver Arch that: (a) PVDII believed it would, during a two-year period, need a peak debt amount of $31 million to begin the contemplated work on Bridge Pointe and Reflection Pointe; (b) PVDII believed

final construction would be complete in four years; and (c) additional work beyond the initial two-year period would be funded via a combination of additional debt and a portion of the proceeds received from the sales of lots and homes, but would "not occur without appropriate sales during the initial two-year term."

18.     The data underlying this business plan summary was provided in numerous other documents provided to Silver Arch including, *inter alia*, detailed financial models (in the form of excel spreadsheets) for Bridge Pointe and Reflection Pointe.

19.     In a tab on these spreadsheets titled "monthly," there were tables captioned "Construction Loan Summary" for both Bridge Pointe and Reflection Pointe.

20.     Upon review of these tables (and other documents) it is evident that PVDII planned to borrow money over the course of a four-year period during which its development and construction work would be completed, the peak debt amount PVDII believed it needed was approximately $31 million and occurred during the initial two-year period, and the aggregate amount of the draws PVDII intended to make to complete development and construction exceeded $31 million.

21.     Consistent with this reality, on the first tab of the financial model spreadsheets for Bridge Pointe and Reflection Pointe provided to Silver Arch, captioned "Assumptions," in a box captioned "Construction Financing," PVDII placed the letter "Y" next to a box stating: "Constr Loan" ("Y" if revolving).

22.     In connection with the provision of these diligence materials, and consistent with the information provided therein, PVDII also submitted a request to Silver Arch for a $31 million loan.

23.    Thereafter, Silver Arch sent a Term Sheet for the loan to PVDII on or about December 3, 2018.

24.    In this Term Sheet, Silver Arch indicated that based on its "preliminary evaluation of [PVDII's] loan request, [Silver Arch] w[ould] initiate due diligence for a loan to PVDII . . . in the principal sum of Thirty One Million Dollars ($31,000,000) based on the terms of this Term Sheet."

25.    Among other terms set forth in the Term Sheet were a requested loan amount of $31,000,000; a two (2) year term with one (1) option to extend for twelve (12) months; a completion guarantee from PVD's principal, Mark Fischer; a description of the work PVDII intended to fund using the loan proceeds; a loan to value ratio or "LTV" of 65%; and a Due Diligence Deposit of $120,000.

26.    By the time it submitted the Term Sheet to PVDII, Silver Arch had been provided voluminous documentation indicating PVDII believed it needed more than $31 million in loan draws and more than two (2) or three (3) years to complete its contemplated work on Bridge Pointe and Reflection Pointe.

27.    In light of this reality, PVDII believed Silver Arch understood PVDII's business plan and the structure of the proposed loan and that based on, among other things, the construction guarantee offered by Mr. Fischer, Silver Arch was comfortable with the same, provided appraisals and other remaining diligence were successfully completed.

28.     As would become clear later, however, the reality of the matter was that Silver Arch had not substantively reviewed *any* of the documents or deal terms provided by PVDII prior to issuing the Term Sheet.

29.     The reason it never reviewed any of these materials is that Silver Arch's plan all along was to induce PVDII to pay certain advance fees to Silver Arch that Silver Arch would later claim it was entitled to retain based on the fact that no loan was consummated.

30.     Unfortunately, and as detailed below, this "bait and switch" enticement to receive and retain advance fees from putative borrowers for which it has no real interest in exploring a potential loan is a long-standing practice of Wolfer and his companies, including Silver Arch.

31.     The first instance in which it became clear Silver Arch never intended to seriously consider making the requested loan to PVDII came in connection with an appraisal commissioned regarding the value of the Property both in its current state and after the development and construction work on Bridge Pointe and Reflection Pointe planned by PVDII.

32.     As noted above, the Term Sheet indicated that the amount of any loan from Silver Arch to PVDII could not exceed sixty five percent (65%) of the appraised value of the Property as developed – *i.e.*, in order for Silver Arch to agree to loan PVD the requested $31,000,000, the Property, as fully developed, would need to have an appraised value of approximately $47.69 million.

33.    Following the execution of the Term Sheet by Silver Arch and PVDII, Silver Arch commissioned an appraisal of the Property from Newmark Knight Frank ("Newmark").

34.    Silver Arch provided instructions and assumptions to Newmark concerning the appraisal that were not shared with PVDII even after they had requested.

35.    This was done in an attempt by Silver Arch to ensure the value of the Property did not satisfy the required 65% loan to value ratio set forth in the Term Sheet.

36.    Silver Arch's plan was, in fact, to ensure the appraised value was so low that PVDII would walk away from its dealings with Silver Arch and Silver Arch would claim an entitlement to retain the $120,000 Due Diligence Deposit already paid to Silver Arch by that time.

37.    Consistent with this plan, Newmark's initial appraisal, which was issued on or about December 20, 2018, indicated that following the development and construction of Bridge Pointe and Reflection Pointe, the Property would be worth $32,800,000.

38.    Given the required 65% loan to value ratio set forth in the Term Sheet, this would not support the $31,000,000 loan requested by PVD.

39.    The depressed appraised value obtained from Newmark at Silver Arch's direction was consistent with the historical practices of Wolfer's companies, which routinely work with appraisers to ensure appraised values are so low that borrowers will not go forward and Wolfer's companies can retain advance "due diligence" fees paid to the companies.

40.    This scheme did not, however, work on PVDII.

7

41.     PVDII, by itself and through Infinity, provided Newmark with substantial documentation to adjust the appraisal upward by, *inter alia*, refining the comparable properties reviewed as collateral to back the proposed loan.  Even armed with this support, however, the Newmark appraisal still incorporated pricing and discounting factors that kept it from supporting the amount of the requested loan.

42.     Still eager to make the deal work, PVDII then agreed to add additional property to the collateral base to help support the required 65% loan to value ratio.

43.     The culmination of this work was a revised appraisal from Newmark issued on or about March 12, 2019 which indicated that upon the development and construction of Bridge Pointe and Reflection Pointe, the Property (along with other collateral which would be pledged) would be valued at $41,500,000.

44.     Based upon the sixty five percent (65%) loan to value ratio set forth in the Term Sheet, this appraised value supported a loan to PVDII in the amount of $26,975,000.

45.     Although this amount was less than the $31,000,000 it had requested, PVDII let Silver Arch know that it had enough contingency in the figures and could use $26,975,000 to complete its intended work at Bridge Pointe and Reflection Pointe.

46.     In short, Silver Arch's attempt to derail the process early on with a depressed appraisal that would allow Silver Arch to retain certain advance fees paid by PVDII failed and instead, the parties moved forward in the loan process.

47.     Per the Term Sheet, the next step was for Silver Arch, acting through Wolfer, to send a Loan Offer to PVDII on or about March 19, 2019 which "confirm[ed]

8

that the amount of the loan Silver Arch is willing to make based on the valuation of the collateral and the terms, conditions, and requirements of the Term Sheet is $26,975,000."

48.     PVDII accepted and agreed to this Loan Offer and then proceeded to submit a Loan Application to Silver Arch requesting the contemplated $26,975,000 loan on the terms and conditions set forth in the Term Sheet.

49.     This Loan Application was submitted to Silver Arch on or about April 11, 2019.

50.     The Loan Application required yet another advance fee be paid to Silver Arch; this time an additional 0.5% of the loan amount or $134,875, captioned as a "Good Faith Deposit."

51.     Like the Term Sheet, the Loan Application indicated that Silver Arch's commitment to make the contemplated loan was subject to "among other things, the approval of its loan/credit committee" and provided that "[i]f the committee does not approve the loan with no material changes or additions to the economic terms or the terms of the guarantees, Lender shall promptly refund to the Borrower the Good Faith Deposit in full and Due Diligence Deposit less actual third-party expenses."

52.     In connection with this Loan Application, Silver Arch also promised PVDII that Silver Arch would "work in good faith to complete the Closing by April 20, 2019."

53.     This never happened. Instead, and again consistent with the historical business practices of Wolfer's companies, Silver Arch did *no* work to try to close the loan and consistently threw up unfounded road blocks in an effort to ensure no loan was made and Silver Arch could claim entitlement to advance fees and deposits paid by PVDII.

54.    Evidence of Silver Arch's lack of good faith is the fact that unbeknownst to PVDII, Silver Arch had, prior to its receipt of PVDII's Loan Application, still had done *nothing* to evaluate its proposed loan to PVDII other than to commission an appraisal from Newmark – *i.e.*, Silver Arch had still not reviewed the diligence materials provided to it prior to receiving and accepting PVDII's Loan Application.

55.    At that point, nearly six (6) months in to the parties' relationship and months after having received documents requested from PVDII in due diligence and importantly, two (2) advance fees totaling approximately $250,000, Silver Arch began for the first time to at least pretend to review the deal.

56.    On April 30, 2019 – ten (10) days after the contemplated closing date set forth in the Loan Application – Silver Arched raised the one (1) and only issue it had with contemplated loan, writing an e-mail in which it asked Infinity "[w]hat [PVDII] ha[d] on backup for the cost to complete" development and construction of Bridge Pointe and Reflection Pointe.

57.    In this e-mail and subsequent correspondence, Silver Arch indicated that it "need[e]d to get comfortable that the planned improvement can be completed for the budgeted amounts" set forth in the diligence materials previously provided by PVDII noting that, according to Silver Arch, it "[n]ormally . . . ha[s] bonded fixed price contracts to rely on."

58.    To be clear, Silver Arch did not, at this point, raise any issue concerning either: (a) the fact the stated loan amount was $26.975 million, but PVDII's estimated development and construction costs were well in excess of this figure; or (b) the term of

the proposed loan was two (2) years (with a one (1) year extension), but PVDII's projections showed it would take four (4) years to complete the contemplated work.

59.     Instead, Silver Arch merely inquired as to whether the development and construction costs were, in fact, known to be approximately $48 million plus interest expense or whether instead, they might end up being higher than estimated because contracts for the work had not yet been obtained.

60.     PVDII was, at this point, understandably frustrated by the fact it had: (a) provided documents exhaustively detailing its business plan and construction estimates to Silver Arch months before this issue was raised; and (b) on a number of occasions asked Silver Arch (without ever receiving a response) if there was any additional information needed in connection with the due diligence process.

61.     Notwithstanding its frustration, PVDII attempted to work with Silver Arch during the following days in an effort to get the contemplated $26,975,000 loan closed.

62.     During this time, Silver Arch never indicated that it had any trouble understanding the financial models PVDII had provided during diligence or that it had a concern that PVDII could not fund development and construction costs associated with Bridge Pointe and Reflection Pointe using loan proceeds.

63.     Silver Arch's only concern was that the actual costs would match PVDII's estimates and ultimately, Silver Arch indicated it could not gain comfort that this would be the case.

64.     Again, Silver Arch was looking for a reason not to close a loan with PVDII and keep the advance fees it had already received.

11

65.     In furtherance of this plan, Silver Arch at this point changed one of the established terms in the agreement from a 65% loan to value ratio to a 65% cost to value ratio.

66.     PVDII had sufficient collateral for the $26,975,000 loan to comply with the 65% loan to value requirement, but with a 65% cost to value ratio PVDII would now have to supply an additional $32,000,000 in collateral value to comply with the new requirement – something Silver Arch knew would be unacceptable to PVDII.

67.     PVDII was, of course, unwilling to even consider this new requirement.

68.     Consequently, the parties' discussions of a $26,975,000 loan stalled out before Silver Arch's loan/credit committee could ever consider the same.

69.     At that point, and in a last ditch effort to work with Silver Arch, PVDII attempted to explore the possibility of a smaller loan that PVDII would use only to develop the "horizontal" portion of the Bridge Pointe and Reflection Pointe developments.

70.     The notion of this contemplated deal was that PVDII would borrow a smaller amount of money with its proposed collateral to complete infrastructure and other work necessary on the development, but not go "vertical" by constructing any homes and/or other residences in either Bridge Pointe or Reflection Pointe.

71.     In connection with this alternative deal, PVDII estimated that it would need a loan of approximately $18.5 million to complete this portion of the development on Bridge Pointe and Reflection Pointe.

72.     Upon request from Silver Arch, Newmark then issued a third appraisal on or about June 26, 2019 which indicated that the contemplated "horizontal" work would create $19,900,000 in value.

73.     This amount when aggregated with additional raw land PVDII offered as collateral and worth $12,900,000, created a total value of $32,800,000 and would support a loan of $21,320,000 under the 65% loan to value ratio.

74.     Once more seeking to throw up a road block, however, Silver Arch now indicated it would only be willing to loan 55% of appraised value, or approximately $18 million.

75.     Silver Arch also indicated that other material terms of the proposed deal would have to be changed including increasing the interest rate, significantly increasing the amount of prepaid interest, and expanding the scope of the guarantee to be provided by Mr. Fischer.

76.     Again, Silver Arch was not working with PVDII in good faith, but instead attempting at every turn to create a road block that would turn PVDII away and allow Silver Arch to retain advance fees PVDII had already paid to Silver Arch.

77.     Silver Arch's requests to change material terms of the deal – the reduction in the loan to value ratio, the increase in interest rate, and the expansion of the scope of the guarantee – were unacceptable to PVDII and ultimately the parties parted ways on or around July 19, 2019 – over eight (8) months after the original Term Sheet was signed and a far cry from the "less than 30 days to closing" that Silver Arch advertises.

78.     In the wake of this falling out, a dispute arose concerning entitlement to the advance fees PVDII had paid to Silver Arch.

79.     As a reminder, at the time the Term Sheet was executed in December 2018, PVDII deposited with Silver Arch what the Term Sheet referred to as a one hundred twenty thousand dollars ($120,000) Due Diligence Deposit.

80.     According to the Term Sheet, this "Due Diligence Deposit [was to] be utilized to cover reasonable costs for Lender's site inspection, appraisal, legal retainer, underwriting, and evaluation procedures."  Most of this was never done.

81.     As relevant here, the Term Sheet goes on to explain that if Silver Arch's loan/credit committee "does not approve the loan with no material changes or additions to the economic terms or the terms of the guarantees, [Silver Arch] shall promptly refund to [PVDII] the . . . Due Diligence Deposit less actual third party expenses."

82.     Consistent with the fact it never intended to explore the possibility of or make a loan to PVDII, Silver Arch has admitted that it did not even go so far as to present any loan for consideration to its loan/credit committee, but has nevertheless refused to return any portion of the Due Diligence Deposit to PVDII.

83.     At the time of PVDII's submission of the Loan Application in April of 2019, PVDII sent an additional one hundred thirty-four thousand eight hundred seventy five dollars ($134,875.00) to Silver Arch which the Loan Application designates as a "Good Faith Deposit."

84.     Consistent with the Term Sheet, the Loan Application also indicates that if Silver Arch's loan/credit committee "does not approve the loan with no material changes

or additions to the economic terms or the terms of the guarantees, [Silver Arch] shall promptly refund to [PVDII] the Good Faith Deposit in full and Due Diligence Deposit less actual third party expenses."

85.     Following the submission of this Loan Application, Silver Arch: (a) changed the material terms of the proposed loan and guarantee (lowering the amount of the loan to value ratio, raising the interest rate, and expanding the scope of the guarantee from Mr. Fischer); and (b) never submitted these terms for consideration by its loan/credit committee and by that inaction, Silver Arch's loan committee did not approve the loan.

86.     Silver Arch has, nevertheless, refused to refund the Good Faith Deposit to PVDII.

87.     Upon information and belief, Silver Arch may claim a right to retain the Due Diligence Deposit and/or the Good Faith Deposit based upon a purported entitlement to liquidated damages equal to one percent (1%) of the proposed $26,975,000 loan contemplated by the Loan Offer and Application.

88.     Any such claim is belied not only by the terms of the parties' agreements, but also by the fact that a one percent (1%) liquidated damages claim would be a penalty and therefore unenforceable as a matter of law.

89.     Unfortunately, the practice of claiming an entitlement to advance fees paid by putative borrowers in connection with proposed loans a lender never seriously considered making is not new to Wolfer or his businesses.

90.     Wolfer was previously involved in another New Jersey based lending institution known as Kennedy Funding Incorporated ("KFI").

91.     KFI is, upon information and belief, still owned and operated by other members of Wolfer's family.

92.     In a 2008 opinion dealing with fraud and other related claims asserted against KFI and Wolfer by a putative borrower, the United States District Court for the District of New Jersey observed that Wolfer's former company had "been sued so many times on similar Loan Commitments that it has, for better or worse, generated its own body of law . . . ." *See Royale Luau Resort, LLC v. Kennedy Funding, Inc., Jeffrey Wolfer, Joseph Wolfer, John Does 1-10*, Case No. 07-cv-01342 (D. N.J., opinion issued Feb. 19, 2008) at 11 (gathering cases).

93.     As a review of these cases demonstrates, putative borrowers have, on numerous occasions, alleged that pre-loan documents (Term Sheets, Offers, Applications, etc.) from companies operated by Wolfer are "part of [a] fraudulent scheme to induce [putative borrowers] to pay [Wolfer's companies] an advance fee, even though [the companies] and the Wolfers never intended to provide a loan to" to the putative borrowers. *See Kennedy Funding, Inc. v. Ruggers Acquisition and Development, et al. v. Jeffrey Wolfer, Kevin Wolfer*, Case No. 07-cv-00669 (D. N.J., opinion issued July 31, 2007) at 7-8.

94.     In one Complaint filed against Wolfer and KFI in March of 2009, the plaintiff detailed a scheme used by KFI that included, as relevant here, a situation in which "[a]fter the issuance of the 'loan commitment' but prior to the loan closing, the

Defendants proceeded to make demands of additional documents and procedures that were not contemplated in the 'loan commitment.'" *See Aroma Hotels Danbury, LLC v. Kennedy Funding, Inc. Jeffery Wolfer, et al.*, Case No. 09-cv-01297 (D. N.J.) (Complaint filed Mar. 20, 2009) at 11 (¶ 84).

95.     These plaintiffs alleged that "KFI and the Wolfer defendant[s] knew they did not intend to make a loan to the Plaintiffs prior to issuing the so-called 'loan commitment.'" *See id.* at 16 (¶ 124).

96.     In further support of a RICO claim against KFI, Wolfer, and others, the Plaintiffs in the *Aroma Hotels* case went on to detail various other instances in which "[KFI] entered into a 'loan commitment', received an advance fee [then] failed to close any loan yet retained the advance fee," *see id.* at 16 (¶ 128) including: (a) a situation in which a putative borrower in Florida submitted advance fees to KFI and after receiving these fees KFI's "actions were limited to sending an unqualified person to evaluate the value of the collateral and otherwise deflecting the efforts of [the putative borrower] and its agents to close the subject loan," *see id.* at 23 (¶ 180); (b) another situation in which a putative Florida borrower submitted advance funds to KFI and "KFI and the Wolfer Defendants all failed to take any action toward closing the loan," *see id.* at 32 (¶ 261); (c) another situation in which after advance fees were paid "to Kennedy Funding a pattern emerged where the Wolfer defendants and Kennedy Funding began to systematically block all efforts by [the putative borrower] and its representatives from completing the proposed transaction, *see id.* at 43 (¶ 332); and (d) multiple other examples of similar conduct.

17

97.     In an unpublished Opinion, the United States Court of Appeals for the Third Circuit affirmed the verdict entered in a bench trial before the United States District Court for the District of New Jersey wherein it was determined that in connection with claiming an entitlement to advance fees, KFI and Wolfer violated the duty of good faith and fair dealing included in all contracts. *See Omni Credit Alliance Inc. v. Kennedy Funding, Inc., Joseph Wolfer and Jeffrey Wolfer*, Case No. 08-0178 (3d. Cir. Mar. 22, 2010).

98.     In its Opinion, the 3rd Circuit explained that "the District Court's decision [wa]s supported by its findings regarding Kennedy's post-commitment behavior – to wit, its failure to negotiate in good faith by (1) merely 'deflecting Omni's collateral proposals and rejecting them with little explanation'; and (2) declining to 'take any reasonable steps to close the loan.'" *See id.* at 2-3.

99.     As potential borrowers have noted in posts on the internet, the schemes Wolfer relied upon at KFI have persisted at his new company, Silver Arch. As one putative borrower has explained:

> Be warned: Silver Arch Capital Partners is a scam. These are the same dishonest individuals from Kennedy Funding. Senior management simply started a new company and are now operating the same way as Kennedy Funding. They ask for large advanced fees and do not deliver loans. Silver Arch CEO is Jeff Wolfer. This is the same Jeff Wolfer from Kennedy Funding. All other senior managers at Silver Arch are from Kennedy Fundings as well. Do not do business with these people. They are dishonest and unethical individuals, with numerous lawsuits against them. They are just running another "advanced fee" scam.

*See* http://www.scamion.com/silver-arch-capital-partners-llc-bc

100.    Another putative borrower recently described its dealings with Silver Arch on the social media website reddit.com as follows: "I have used them and they did the exact same thing to us. Play by play. We are going to full litigation to get our deposit back. Borrowers do not use them! They literally switched the terms and stopped communicating with us when we would not agree to the changes. We have not heard back for two months since requesting the deposit. Turned into a nightmare and could cost me        my        job        for        selecting        them."        *See* https://www.reddit.com/r/CommercialRealEstate/comments/atnq0p/do_not_deal_with_silver_arch_capital_partners/

101.    Consistent with the reality that Wolfer has transitioned his business practices from KFI to Silver Arch, at least one putative borrower has, through its bankruptcy trustee, recently sued Silver Arch to recover advance fees paid on a loan that did not close alleging that "the Defendant's commitment to make the Proposed Loan was illusory and there was no possibility the Proposed Loan would ever close." *See Franklin Properties, LLC, though Daniel E. Straffi, Chapter 7 Trustee v. Silver Arch Capital Partners, LLC*, Case No. 17-32931 (D. N.J. Bankr.) (Adversary Proceeding 18-01353) (Complaint filed July 6, 2018) at 4 (¶ 19).

102.    In sum, and consistent with Wolfer's historical business practices, Silver Arch never, at any point, intended to actually consider or even make a loan to PVDII.

103.    Instead, Silver Arch merely strung PVDII along in an effort to obtain advance fees that Silver Arch would later claim an entitlement to retain because no loan was closed.

## Count One
**(Breach of Contract – Silver Arch)**

104.    PVDII incorporates all previous allegations in this Complaint.

105.    PVDII and Silver Arch are parties to a contract.

106.    Silver Arch has breached the parties' contract by failing to return to PVDII monies that are due in owing to PVDII.

107.    PVDII has also suffered incidental and consequential damages as a result of Silver Arch's breach of the parties' contract.

## Count Two
**(Breach of the Duty of Good Faith and Fair Dealing – Silver Arch)**

108.    PVDII incorporates all previous allegations in this Complaint.

109.    PVDII and Silver Arch are parties to a contract.

110.    Included within this contract is an implied duty of good faith and fair dealing.

111.    Silver Arch has breached this duty by failing to deal with PVDII in good faith.

112.    PVDII has been damaged by Silver Arch's breach of its duty to PVDII in an amount to be determined at trial, but which exceeds $75,000.

## Count Three
**(Fraud – Silver Arch and Wolfer)**

113.    PVDII incorporates all previous allegations in this Complaint.

114.    Thorough the course of their dealings with PVDII, Silver Arch and Wolfer made numerous false statements to PVDII, including those detailed throughout this Complaint.

115.    More specifically, each and every time Silver Arch communicated, whether orally or in writing (including in the Loan Offer signed by Wolfer) that it intended to consider and potentially make a loan to PVDII, these statements were false.

116.    Silver Arch and Wolfer knew that Silver Arch never intended to consider or make a loan to PVDII.

117.    Instead, Silver Arch's plan all along was to induce PVDII to pay advance fees that Silver Arch would later claim an entitlement to retain based on the fact no loan had closed.

118.    Silver Arch and Wolfer made these statements to PVDII in hopes that PVDII would rely upon them to its detriment.

119.    PVDII did, in fact, reasonably rely on these false statements to its detriment and has, as a result, been damaged in an amount to be determined at trial, but which exceeds $75,000.

120.    The statements of Silver Arch and Wolfer were also made in reckless disregard for the rights of others and/or intentionally and with malice toward others and thus, PVDII is also entitled to recover punitive damages in an amount to be determined at trial.

**Count Four**
**(Violation of the Oklahoma Consumer**
**Protection Act – Silver Arch and Wolfer)**

121.    PVDII incorporates all previous allegations in this Complaint.

122.    The conduct of Wolfer and Silver Arch described in this Complaint constitute unfair and deceptive trade practices as defined by 15 Okla. Stat. § 752(13) and (14).

123.    These acts are violations of the OCPA as set forth in 15 Okla. Stat. § 753(20).

124.    PVDII is, therefore, entitled to recover the damages it has suffered as a result of these acts pursuant to 15 Okla. Stat. § 761.1(A), as well as its attorneys' fees and costs.

125.    The amount of these damages will be determined at trial, but exceed $75,000.

126.    Because Wolfer's and Silver Arch's conduct is also unconscionable, PVDII is also entitled to recover from Wolfer and Silver Arch a $2,000 civil penalty for each such action taken pursuant to 15 Okla. Stat. § 731.1(B).

WHEREFORE, having fully pleaded its causes of action against Silver Arch and Wolfer, PVDII prays the Court enter judgment in its favor and against Silver Arch and Wolfer and award to PVDII all damages which it has suffered, along with punitive damages, and any other relief to which PVDII is entitled including but not limited to its attorneys' fees and costs.

Respectfully submitted,


*/s/Michael K. Avery*
Michael K. Avery, OBA #22476
McAfee & Taft A Professional Corporation
Two Leadership Square, Tenth Floor
211 N. Robinson
Oklahoma City, OK 73102
Telephone: 405.235.9621
Fax: 405.270.7212
michael.avery@mcafeetaft.com

*Counsel for Plaintiff, PVD Phase II, LLC*